IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ICEUTICA PTY LTD, et al.          *

            Plaintiffs       *

            vs.              *  CIVIL ACTION NO. MJG-17-0394

LUPIN LIMITED, et al.             *

            Defendants       *

*      *      *      *      *      *      *      *      *

## MEMORANDUM AND ORDER: CLAIM CONSTRUCTION

In its First Amended Complaint [ECF No. 42], Plaintiffs iCeutica Pty Ltd. and Iroko Pharmaceuticals, LLC ("Plaintiffs") allege that Defendants Lupin Limited and Lupin Pharmaceuticals, Inc. ("Lupin") infringe claims of United States Patent Nos. 9,526,734 ("the '734 patent") and 9,649,318 ("the 318 patent")(collectively, "the Patents-in-Suit").

Pursuant to the Scheduling Order [ECF No. 35], the parties have filed materials relating to what they specify as material claim construction issues and disagree as to the construction of one term.  The Court has held a Markman[1] hearing and has had the benefit of the arguments of counsel. The Court herein presents its construction of the claim term at issue.

---

[1] Markman v. Westview Instruments, Inc., 517 U.S. 370, 390 (1996).

I.    BACKGROUND

    A.    The Invention

The alleged invention is the formulation of doses (5 milligram ("mg") and 10 mg) of the drug meloxicam[2] that are milled to meet a specified nanoparticulate size distribution profile.[3] '734 Patent 2:7-14. A dose meeting the claim limitations allegedly has desirable pharmacokinetic properties and provides effective pain relief to patients suffering from osteoarthritis while exposing patients to a "relatively low[er]" amount of meloxicam than other products on the market. Id.

The parties assert that three claim terms required construction but agree as to the construction of two of them. The terms for which there is no construction dispute are:

| Agreed Claim Term | Agreed Upon Construction |
|---|---|
| "mean plasma AUC(0-∞)" | The arithmetic mean plasma AUC(0-∞) |
| "mean plasma Cmax" | The arithmetic mean plasma Cmax |

Joint Claim Constr. Statement 8, ECF No. 50.

The parties have identified a single term, "population of healthy adults," that requires judicial construction. Lupin contends that the term is indefinite while the Plaintiffs contend that the term is clear to a person of ordinary skill in the art:

---

[2] Meloxicam is a nonsteroidal anti-inflammatory drug ("NSAID") used to manage osteoarthritis pain. '734 Patent at 1:24-48.
[3] The drug particles are ground down until the diameter of the particles reaches the desired nanomolecular size ($10^{-9}$ meters).

| Disputed Term | Plaintiffs' Proposed Construction | Lupin's Proposed Construction |
|---|---|---|
| "population of healthy adults" | A group of adult volunteers possessing good health such that they are eligible to participate in a pharmacokinetic clinical study. | Indefinite |

Id. at 4.

The disputed term appears in two independent claims of the '734 patent and in three independent claims of the '318 patent. A representative claim from the '734 patent is set forth hereafter, with the term at issue emphasized.[4]

Independent Claim 1 of '734 patent:

> 1. A capsule form of a pharmaceutical composition comprising 5 mg of meloxicam having a median particle size, on a volume basis, between 100 nm and 500 nm and a D(0.9) that is between 1200 nm and 3000 nm, wherein a single capsule, upon oral administration to a **population of healthy adults** in the fasted state, provides a mean plasma AUC (0-∞) of 7500-20000 h*ng/ml and a mean plasma Cmax of 350-950 ng/ml, wherein the dissolution rate is such that, when the capsule is tested using USP Apparatus 1 (baskets) set to rotation speed of 100 RPM in 500 mL of pH 6.1 phosphate buffer with 0.1% sodium lauryl sulfate (SLS) at 37° C.+0.5° C., at least 80% of the meloxicam dissolves in 10 minutes or less, wherein a single capsule is effective for treating osteoarthritis pain.

---

[4] All five of the independent claims use "population of healthy adults" in the same context when describing pharmacokinetic data.

'734 patent 25:33-46 (emphasis added).


II.  DISCUSSION

    A.  General Principles

       1.  Claim Construction

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004) (citing Aro Mfg., Co. v. Convertible Top Replacement Co., 365 U.S. 336, 339 (1961)).

The construction of patent claims is a matter for the Court. Markman, 517 U.S. at 390. A court need only construe, however, claims "that are in controversy, and only to the extent necessary to resolve the controversy." Vivid Techs., Inc. v. Am. Science Eng'g, Inc., 200 F.3d 795, 803 (Fed. Cir. 1999) (citations omitted).

When a court relies solely upon the intrinsic evidence—the patent claims, the specification, and the prosecution history— the court's construction is a determination of law. See Teva Pharm. USA, Inc. v. Sandoz, Inc., 135 S. Ct. 831, 841 (2015). "In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic

evidence in order to understand, for example, the background
science or the meaning of a term in the relevant art during the
relevant time period." Id.

The Court must construe claim terms as they would be
understood, in the context of the patent, by one of ordinary
skill in the pertinent art.

As expressed in Phillips v. AWH Corp.:

> We have frequently stated that the words of
> a claim are generally given their ordinary
> and customary meaning.  We have made clear,
> moreover, that the ordinary and customary
> meaning of a claim term is the meaning that
> the term would have to a person of ordinary
> skill in the art in question at the time of
> the invention, i.e., as of the effective
> filing date of the patent application.
>
> . . . .
>
> Importantly, the person of ordinary skill in
> the art is deemed to read the claim term not
> only in the context of the particular claim
> in which the disputed term appears, but in
> the context of the entire patent, including
> the specification.

415 F.3d 1303, 1312-13 (Fed. Cir. 2005)(citations omitted).


2.    Indefiniteness

The Patent Act requires applicants to "particularly point[]
out and distinctly claim[] the subject matter which the inventor
or a joint inventor regards as the invention." 35 U.S.C. §
112(b). A patent is invalid for § 112 indefiniteness "if its

claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." <u>Nautilus, Inc. v. Biosig Instruments, Inc.</u>, 134 S. Ct. 2120, 2124 (2014).

While a patent must be precise enough to afford clear notice of what is claimed, "absolute precision is unattainable" and "some modicum of uncertainty... is the price of ensuring the appropriate incentives for innovation." <u>Id</u>. at 2128-9.

Furthermore, because patents are presumed to be valid, "[a]ny fact critical to a holding on indefiniteness... must be proven by the challenger by clear and convincing evidence." <u>One-E-Way, Inc. v. Int'l Trade Comm'n</u>, 859 F.3d 1059, 1062 (Fed. Cir. 2017)(citing <u>Cox Commc'ns, Inc. v. Sprint Commc'n Co. LP</u>, 838 F.3d 1224, 1228 (Fed. Cir. 2016)).


B.    Construction of "Population of Healthy Adults"

The applicable claims of the Patents-in-Suit limit the scope of the patent to an accused dose by reference to pharmacokinetic data obtained from a testing of the dose upon a "population of healthy adults."  The stated pharmacokinetic data describes the concentration of the drug absorbed in the bloodstream over a period of time and is defined by three key terms: (1) Area under curve ("AUC $(0-\infty)$") meaning the total

exposure expressed in nanograms * hours/milliliters ("ng*h/mL");
(2) maximum concentration ("Cmax"); and (3) the time it takes to
reach Cmax ("tmax").



### 1.  Parties' Contentions

Lupin contends that the term "population of healthy adults"
is indefinite pursuant to 35 U.S.C. § 112 because the
pharmacokinetic data resulting from a test would vary materially
depending on characteristics of the population to which the
product is administered. Defs.' Open. Claim Constr. Br. 1, ECF
No. 54-1. Lupin argues that the Plaintiffs do not specify any
physical characteristics of the "population of healthy adults"
in the claims or specification which can affect materially the
pharmacokinetic data produced from administration of an accused
product.  Lupin cites data from its pharmacokinetic study[5]

---

[5] Lupin conducted its pharmacokinetic studies in India where the

showing that its AUC (0-∞) value of 21,322.22 ng*h/mL (obtained

from administering 5 milligrams of its meloxicam formulation)

fell outside of the claimed AUC(0-∞)range of 7500-20000 ng*h/mL

in the '734 and '318 patents as shown in the following table:

| Lupin's AUC(0-∞) for its 5mg Product | Plaintiffs claimed AUC(0-∞) Range |
|---|---|
| 21,322.22 ng*h/mL | 7500-20000 ng*h/mL |

Lupin's Original ANDA LMELOX0000921, ECF No. 74-1; see also

Megan Chacon Letter to Karen Cassidy 2, ECF No. 74-2.

Plaintiffs argue that for infringement determination

purposes, Lupin's data must be adjusted to reflect what would be

the product's effect on the United States ("U.S") population.

Lupin contends that a person of ordinary skill in the art cannot

reasonably apply the claim limitations without knowing the

pertinent characteristics of the chosen "population of healthy

adults."[6] Because specific population characteristics — such as

individual weight — were not defined in the patent or otherwise

available to the public, Lupin argues that the claims are

indefinite.

---

mean body weight of participants was 60.5 kilograms ("kg"), 22.1
kg lighter than the mean body weight of the intended United
States ("U.S.") population. See Lupin Bioequivalence Fasting
Study of Meloxicam Capsules 10 mg LMELOX0008428, ECF No. 56-11.
[6] Plaintiffs' expert, Dr. Weiner, submits that it is well known
that individuals with lower body weight will have a higher
exposure to a drug than individuals with a higher body weight,
resulting in higher pharmacokinetic data (i.e. higher AUC (0-∞)
values). Dr. Weiner Resp. Decl. ¶15, ECF No. 72-9.

Plaintiffs argue that "population of healthy adults" is sufficiently definite to inform a person of ordinary skill in the art of the scope of the invention. Plaintiffs contend that "population of healthy adults" should be construed to mean "[a] group of adult volunteers possessing good health such that they are eligible to participate in a pharmacokinetic clinical study." Joint Claim Constr. Statement 4, ECF No. 50.

In support of its position, Plaintiffs primarily rely on extrinsic evidence from expert testimony by Dr. Weiner and guidance documents issued by the U.S. Food and Drug Administration ("FDA"). Dr. Weiner insists — as confirmed by FDA guidance — that the only restrictions of a population for pharmacokinetic studies are that its participants are at least 18 years of age and "healthy" such that "the product can be safely administered" to the population. FDA Guidance for Industry: Bioavailability and Bioequivalence Studies Submitted in NDAs or INDs—General Considerations 7, ECF No. 56-7 ("FDA Bioeq. Guidance").

Plaintiffs further argue that Lupin's pharmacokinetic data should be adjusted to reflect the mean body weight of the U.S. population in accordance with FDA guidance and standard industry

practice for normalizing foreign clinical data.[7] Pls.' Resp. Claim Constr. Brief 7, ECF No. 72.

Plaintiffs contend that the extrinsic evidence establishes that a person of ordinary skill in the art would know how to choose a "population of healthy adults" and how to adjust data of a population at variance from a United States population such that the bounds of the invention are reasonably certain. Hence, a person of ordinary skill in the art of would know that it was necessary to adjust the results obtained from a population with individual weights markedly below what would be the weight of subjects in a United States population.

Plaintiffs and Lupin agree that a person of ordinary skill in the art would be a hypothetical person in the 2014-2015 timeframe who possesses an advanced degree (or substantial practical experience) in pharmacy, pharmaceutics, chemistry, medicine or a closely related discipline and with at least three years of experience working with drug development, dosage formulations, or bioavailability clinical studies. Dr. Weiner Open. Decl. ¶ 17, ECF No. 56-1; Dr. Silverman Open. Decl. at ¶ 17, ECF No. 53.

---

[7] Plaintiffs set forth a formula for adjusting data based on weight differences from foreign clinical data. After adjusting Lupin's data to reflect the target U.S. population for its Abbreviated New Drug Application ("ANDA") product, the AUC (0-∞) value for 5 mg administrations (15,632.43 ng*h/mL) falls within the claimed range (7,500-20,000 ng*h/mL). See Pls. Resp. Claim Constr. Brief 10, ECF. 72.

2. <u>Court's Construction</u>

The Court finds that the term "population of healthy adults" in the '734 and '318 claims at issue are adequately definite in accordance with 35 U.S.C. § 112. However, the Court does not adopt Plaintiffs' construction of the term and will provide its own construction.

The intrinsic evidence in the '734 and '318 patents indicates that the term "population of healthy adults" is used numerous times when specifically describing results from pharmacokinetic studies.[8] Thus, the term must be construed in the context of what a person of ordinary skill in the art would understand a "population of healthy adults" to be when conducting pharmacokinetic studies. The only other limitations stated on "population of healthy adults" are that the studies were performed in either the "fasted state" or "fed state."[9] '734 Patent 25:38.

---

[8] <u>See</u> '734 patent at 2:17-24, 2:53-58, 2:53-3:12, 3:48-4:23, 4:58-5:16, 5:36-56, 6:38-48, 7:14-23, 7:44- 63, 20:60-21:20, claims 1, 3-5, 7-9; <u>see also</u> '318 patent at 1:5-10, 2:18-31, 2:55-3:14, 3:50-4:25, 4:60-5:19, 5:39-59; 6:41-51; 7:20-27; 7:47-67; 20:61-21:22.
[9] Neither party argued that "fasted state" or "fed state" constitutes a limitation on "population of healthy adults." The fasted (or fed) state of the participants appears to have a significant effect on data and appears to be a standard factor when conducting pharmacokinetic studies. FDA's "Draft Guidance for Meloxicam" even separates the two into different studies. FDA Draft Guidance on Meloxicam, ECF No. 56-8.

Upon consideration of the evidence, the Court finds that a person of ordinary skill in the art would understand both the meaning of the term and the scope of the invention with reasonable certainty.

FDA's guidance for bioequivalence studies and standard industry practice for choosing participants for pharmacokinetic studies clearly indicates that the term "population of healthy adults" means a "study population" of "healthy volunteers" of "18 years of age" such that "the product can safely be administered" to the population. FDA Bioeq. Guidance at 7. The FDA does not provide any other limiting factors such as age, gender, weight, height, race, ethnicity, or body mass index as recommendations for <u>choosing</u> populations for pharmacokinetic studies.[10] <u>Id.</u> (emphasis added).

The scope of the invention is also reasonably certain to a skilled artisan. The claimed pharmacokinetic values for AUC (0-∞) and Cmax are expressed in terms of a range of values with upper and lower bounds. Counsel for Lupin admitted during the Markman hearing that:

> [n]ormally what you do is you adjust that range so that regardless of variations in the population, you cover them. So you could test it in any healthy person, any group, be it underweight, overweight, one ethnicity,

---

[10] FDA does impose other limitations in rare cases for gender-specific drugs or drugs with risky toxicity profiles. FDA Bioeq. Guidance at 7. Neither is an issue for meloxicam.

> another ethnicity, across ethnicities and
> weight. And you have a big enough range to
> cover them.

Markman Hr'g. 23:17-22, Dec. 18, 2017. Therefore, the claimed

ranges do not reflect the exact results of Plaintiffs'

pharmacokinetic studies. Rather, Plaintiffs obtained data by

administering its drug to a "population of healthy adults" and

adjusted that data in the patent claims to cover a wide variety

of individuals to whom its drug would ultimately be

administered. This practice is routine in claiming

pharmaceutical inventions and would be known to a person of

ordinary skill in the art and a competitor. Id.

Furthermore, a competitor interested in determining whether

its products infringe on patent claims would conduct its own

pharmacokinetic studies and compare the resultant data with the

limitations stated in the claims. The competitor would have no

problem choosing a "population of healthy adults" as the meaning

of the term is well-known to a skilled artisan. The competitor

would also know that the data from its studies must reflect the

effect of its drug on the entire population to which it could be

administered if marketed in the United States, the country in

which the invention was patented. The competitor would then

either conduct studies using a population of healthy adults that

is representative of the population to which the product will be

marketed or, if not, adjust its data to reflect the intended

population by accounting for factors such as weight, ethnicity, and gender.

In this case, Lupin should have understood that the claimed ranges in the Patents-in-Suit were adjusted to reflect a wide variety of individuals to whom the patented invention would be administered. In order to determine whether its product would infringe, Lupin conducted pharmacokinetic studies on a population of healthy male adults in India.  The mean body weight of the study's participants was 60.5 kg, 22.1 kg lighter than the mean body weight of the intended U.S. population. Lupin Bioequivalence Fasting Study of Meloxicam Capsules 10 mg LMELOX0008428, ECF No. 56-11. These studies produced an AUC(0-∞) value of 21,322.22 ng*h/mL, falling outside of the claimed AUC(0-∞) range of 7500-20000 ng*h/mL. Lupin's Original ANDA LMELOX0000921, ECF No. 74-1.

Although Lupin's AUC(0-∞) value may have fallen outside of the claimed range, the patent claims are still definite because the scope of the claims is reasonably certain to a skilled artisan. The scope of the invention regarding AUC(0-∞) values is bound by 7500 and 20000 ng*h/mL when tested in a population of healthy adults. The claims are not indefinite merely because Lupin's product may not infringe on the claims or because the Plaintiffs prosecuted the patent without adjusting the ranges of its claimed data to reflect every possible individual to whom

the patented invention could be administered. Perhaps Plaintiffs could have claimed AUC(0-∞) ranges above 20000 ng*h/mL to account for the drug's effect on lighter individuals. In failing to do so, the Plaintiffs limited their invention to AUC(0-∞)values between 7500-20000 ng*h/mL when administered to any population of healthy adults.

Moreover, the infringement analysis herein does not end with evaluating the raw data from Lupin's pharmacokinetic studies. Knowing that the Patents-in-Suit were issued in the U.S. and that it intends to market its product to a wide variety of individuals in the U.S. by seeking FDA approval, Lupin should have adjusted its data to reflect the U.S. population. Since Lupin's studies were performed on a population of male adults in India with a much lighter weight than the average person in the United States (although healthy), it should adjust its data to determine whether its products will infringe if administered to a U.S. population. This analysis would include individuals with many different physical characteristics, including higher weights and body mass indices.

Plaintiffs' expert, Dr. Weiner, cites FDA guidance, scientific publications, and other FDA drug applications in support of the argument that clinical data should be adjusted to account for significant weight (and other) differences. See Dr. Weiner Resp. Decl. ¶11-18, ECF No. 72-9. FDA guidance states

that if "there is a concern about possible intrinsic or extrinsic ethnic differences . . . it should be possible to extrapolate data to the new region." FDA Guidance for Industry Ethnic Factors 2, ECF No. 72-12. Previous drug applications and journal articles further reveal that pharmacokinetic data is routinely adjusted to reflect significant weight differences between populations. C. Naito, <u>Necessity and Requirements of Bridging Studies and their Present Status in Japan</u>, Int'l J. Clin. Pharmacology and Therapeutics, Vol. 38- No. 2/2000(80-86), ECF No. 72-11; <u>see also</u> FDA Mirabegron (Consultation for NDA 202611) 30, 57, ECF No. 72-13.

Even if the FDA does not require Lupin to adjust its data for purposes of approving the generic drug for safety and efficacy (as Lupin contends), Lupin will have to adjust its data for purposes of determining patent infringement if it intends to market its drug to the entire U.S. population. Markman Hr'g. 22:2-5, Dec. 18, 2017.

Adjusting data for significant population weight differences is necessary to determine infringement. However, in regard to claim construction, the Court need only determine whether "population of healthy adults" is sufficiently definite to inform a person of ordinary skill in the art of the scope of the invention. The Court concludes that "population of healthy adults" is definite because a skilled artisan (1) would

understand the meaning of the term as outlined by the FDA, (2) would know that ranges in patent claims are adjusted to capture every possible value that could be practiced by the patented invention, and (3) would be aware that data from pharmacokinetic studies must reflect the entire population to which the competing product will be marketed.

The Court rejects Lupin's arguments referencing <u>Honeywell Int'l, Inc. v. Int'l Trade Comm'n</u>, 341 F.3d 1332 (Fed. Cir. 2003) and <u>Halliburton Energy Servs., Inc. v. M-I LLC</u>, 514 F.3d 1244 (Fed. Cir. 2008) as a basis for indefiniteness. In <u>Honeywell</u>, the Federal Circuit affirmed a holding that Honeywell's claims for a process for making a polymer yarn were indefinite because the Plaintiffs failed to specify which of the four industry-recognized methods for measuring the melting point elevation of a yarn sample were used to obtain the data claimed in its patent.[11] <u>Honeywell</u>, 341 F.3d at 1337. The Court held that no intrinsic guidance in the patent or extrinsic guidance from industry suggested which of the four methods was preferred and should be used. <u>Id.</u> at 1340-41. In this case, there is only one industry-recognized method for choosing a pharmacokinetic study population: choosing participants that are 18 years of age and "healthy" such that "the product can be safely administered" to

---

[11] Only one of the four methods resulted in data that fell within the claimed melting point elevation ranges. <u>Honeywell</u>, 341 F.3d at 1341.

the population. FDA Bioeq. Guidance 7, ECF No. 56-7. A second—
and successive—method is recognized by industry for
extrapolating the data obtained from said studies if physical
characteristics of the population significantly differ from the
intended population. Unlike Honeywell, in regard to the
Patents-in-Suit extrinsic guidance from the industry informs a
person of ordinary skill in the art which methods to use to
ascertain the scope of the invention in this case.

In Halliburton, the Federal Circuit upheld an
indefiniteness finding on claims using the term "fragile gel"
(for use in oil field drilling) because the degree of
fragileness was ambiguous and could vary depending on a variety
of external factors in each individual oil well. Halliburton,
341 F.3d at 1256. The Court reasoned that "[w]hen a proposed
construction requires that an artisan make a separate
determination for every set of circumstances in which the
composition may be used, and when such determinations are likely
to result in differing outcomes (sometimes infringing and
sometimes not), that construction is likely to be indefinite."
Id. at 1255.

However, in the instant case, there is only one relevant
infringement analysis: the result obtained when a competitor's
product is administered to a U.S. population. A skilled artisan
would know that it is routine practice to adjust ranges of

values in a patent claim to capture every possible value that
may be obtained when practicing the claimed invention. A skilled
artisan would also know that it would need to obtain
pharmacokinetic data for its competing product that is
representative of the product's effect on the intended
population (in this case, the U.S. population).

The Court also notes that on December 11, 2017, the Federal
Circuit issued a nonprecedential opinion in which it affirmed an
indefiniteness ruling on claims directed to a drug compound
reciting pharmacokinetic data. Forest Labs., Inc. v. Teva Pharm.
USA, Inc., No. 2016-2550, 2017 WL 6311688 (Fed. Cir. Dec. 11,
2017). The Federal Circuit found that the claims were indefinite
because (1) they recited a range of doses (5-40 mg); (2) it was
not clear whether the pharmacokinetic data was obtained from
human studies or computer-generated models (as discussed in the
specification); (3) human studies can result in widely varying
results; and (4) the claims did not include any physical
properties of the new formulation (of an old drug) other than
the resultant pharmacokinetic data. Id. at *5-7.

The Court will not apply the Federal Circuit's reasoning
in this case because the Patents-in-Suit simply do not rise to
the level of uncertainty as in Forest. The present claims
identify a single dose (5 or 10 mg), relate only to human
studies (limited to fasted or fed state), and recite a variety

of physical properties of the formulation including particle size and dissolution rates. The only factor at issue in this case is the variance of data obtained from human studies. However, the claims are reasonably certain because extrinsic guidance from FDA and standard industry practice informs a skilled artisan how to handle any minor variances in data resulting from physical characteristics of study participants.

Finally, the Court notes that it may have been better for the patentee to include in the patent more detailed information (such as weight, age, ethnicity, etc.) about its "population of healthy adults" and to better inform competitors of how exactly to conduct a competing pharmacokinetic study. However, it is the role of the United States Patent and Trademark Office, not this Court, to mandate disclosure of such information in a patent.

Because Lupin has failed to prove by clear and convincing evidence that Plaintiffs' patents are invalid for indefiniteness, the Court finds that the claims are definite in accordance with 35 U.S.C. § 112.

III. <u>CONCLUSION</u>

For the foregoing reasons, the Court concludes the following regarding the construction of the claim term at issue:

A.  <u>Construction</u>

    1.  The term "population of healthy adults" is construed to mean "a group of volunteers of 18 years of age or older and possessing good health such that they do not possess a medical condition that would prohibit the product from being safely administered."

    2.  The term "mean plasma AUC(0-∞)"   is construed to mean "the arithmetic mean plasma AUC(0-∞)."

    3.  The term "mean plasma Cmax" is construed to mean "the arithmetic mean plasma Cmax."

B.  <u>Indefiniteness</u>

    1.  The Court does not find any claim void for indefiniteness.

SO ORDERED, on <u>Thursday, February 1, 2018.</u>

           /s/          
_____
Marvin J. Garbis
United States District Judge
